UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------x

MARIAN M. INGUANZO,                          :
                                             :
                          Plaintiff,         :
                                             :
        - against -                          :          **OPINION AND ORDER**
                                             :          12-CV-8212 (ER)
HOUSING & SERVICES, INC., KRISTI             :
KIMMERLE-CILENTI, and DERRICK HORTON,        :
                                             :
                          Defendants.        :
------------------------------------------------------------------------x

Ramos, D.J.:

      Plaintiff Marian M. Inguanzo ("Plaintiff" or "Ms. Inguanzo") brings this action against

Housing & Services, Inc. ("HSI"), Kristi Kimmerle,[1] and Derrick Horton[2] (collectively,

"Defendants") pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e-2000e-

17, and the New York City Human Rights Law, Administrative Code § 8-107 et seq.

("NYCHRL"), alleging discrimination based upon her gender, race, and national origin, as well

as retaliation in connection with her complaints regarding the alleged discrimination.  Complaint

("Compl.") (Doc. 1) ¶ 1.  Pending before the Court is Defendants' motion for summary judgment

pursuant to Fed. R. Civ. P. 56.  (Doc. 27)  For the reasons set forth below, Defendants' motion

for summary judgment is GRANTED.

---

[1] According to Defendants, Ms. Kimmerle was "incorrectly sued as Kristi Kimmerle-Cilenti."  Defs. Mem. L. 1.

[2] According to Defendants, Derrick Horton "has not been properly served with the complaint in this matter."  Defs. Mem. L. 1.  Mr. Horton has not appeared in this action.  Plaintiff does not address this issue in opposition to the instant motion.

Because Plaintiff's claims against Mr. Horton suffer from the same deficiencies as against the other defendants, the Court will treat the instant motion as if it were brought on behalf of all defendants.  *Cf. Hamilton v. Broomfield*, No. 95 Civ. 3241 (MBM), 1998 WL 17697, at *1n.1 (S.D.N.Y. Jan. 20, 1998) (dismissing claims against unserved defendants because they were identical to claims against defendants who brought the motion to dismiss); *Johnson v. New York City*, No. 12 Civ. 4379 (KBF), 2013 WL 950870, at *3 (S.D.N.Y. Mar. 7, 2013) (dismissing claims against plaintiff who had not been served); *Virtual Dates, Inc. v. Afternic.com, Inc.*, No. 01 Civ. 4023 (LAK), 2001 WL 1646451, at *2 (S.D.N.Y. Dec. 20, 2001) (same).

I.     **Factual Background**

The following facts are undisputed except where otherwise noted.

Plaintiff is a Hispanic female of Puerto Rican origin who was employed by HSI as a case manager from March 2009 until her termination on November 3, 2011.  Pl.'s 56.1 Counter-Stmt. ¶¶ 15, 17.[3]  HSI provides permanent supportive housing for over 600 formerly homeless men, women, and children at three facilities and a scatter site program ("Scatter Site").  *Id.* ¶¶ 7, 8. Scatter Site consists of 100 apartments leased by HSI at various buildings in Manhattan and the Bronx.  *Id.*  HSI's operations are primarily funded by the government through, *inter alia*, the Human Resources Administration and the HIV/AIDS Services Administration ("HASA").  *Id.* ¶ 9; Defs. Ex. K.[4]

Throughout her employment at HSI, Ms. Inguanzo was a case manager at the Narragansett, HSI's facility located on the Upper West Side of Manhattan, New York.  Her responsibilities as a case manager included participating in initial interviews and orientation with prospective clients referred by HASA; establishing and maintaining individual case records on assigned clients; ensuring that the records conformed to the guidelines established by HASA and HSI; and visiting hospitalized clients.  *See* Defs. Ex. J.[5]  At the start of Ms. Inguanzo's employment, Edward Reardon was program manager at the Narragansett facility and her immediate supervisor.  Mr. Reardon left his employment with HSI in July 2010 after becoming

---

[3] Citations to "Pl.'s 56.1 Counter-Stmt." refer to Plaintiff's Counter-Statement of Material Facts pursuant to Local Civil Rule 56.1, Doc. 33.  Citations to "Defs.' 56.1 Stmt." refer to Defendants' Statement of Material Facts pursuant to Local Civil Rule 56.1, Doc. 29.

[4] As relevant to this opinion, the funding for Scatter Site is provided through a contract between HSI and the Human Resources Administration.

[5] Citations to "Defs. Ex." refer to exhibits to the Declaration of Rhonda L. Epstein in Support of Defendants' Motion for Summary Judgment.  Citations to "Pl. Ex." refer to exhibits to the Declaration of William Teitler in Opposition to Defendants' Motion for Summary Judgment.

terminally ill.  Compl. ¶ 39.  Derrick Horton was hired as Mr. Reardon's replacement in November 2010.  *Id.* ¶ 44.

 At all times relevant to this action, Defendant Kimmerle was HSI's Director of Programs. *Id.* ¶¶ 12, 13; Answer ¶¶ 12, 13.  Ms. Kimmerle was involved in both the decision to hire, and the decision to terminate, Ms. Inguanzo.  Pl.'s 56.1 Counter-Stmt. ¶¶14, 18.

### a. Plaintiff's Performance as Case Manager and Disciplinary Record

 Ms. Inguanzo began her employment at HSI on March 3, 2009.  In her first performance review three months later, on June 10, 2009, Ms. Inguanzo received a 3.40 overall score out of a possible 5.00, placing her in the 'Fully meets requirements 2.50-3.49' performance level.  Defs. Ex. L.  According to the review, Ms. Inguanzo "performs all phases of her job in a timely and professional manner.  She needs little or no assistance carrying out her daily job responsibilities." *Id.*

 On April 28, 2010, Plaintiff received a Disciplinary Action Form charging her with a violation of HSI policy in connection with missing case notes from March 2010.  Defs. Ex. N; Pl.'s 56.1 Counter-Stmt. ¶ 24.  The case notes in question related to a client who, according to the form, informed Ms. Inguanzo on April 13, 2010 that he had been admitted to the hospital the day before.  *Id.*  The client passed away on April 14, 2010, but it was not until the client's family informed HSI's Narragansett staff two weeks later that HSI became aware of the client's death. *Id.*  The form stated that it is the case manager's responsibility to see a client face-to-face "no less than twice a month," and that, in this client's case, Ms. Inguanzo did not conduct a home visit or office visit.  *Id.*  Additionally, Ms. Inguanzo did not visit the client in the hospital to obtain a better understanding of his condition or otherwise follow up with his doctor or the hospital.  *Id.*  The form stated that, when asked about why the March notes were missing, Mr.

3

Inguanzo informed her supervisor that "the notes were in the computer." *Id.* This constituted a further violation of HSI policies because case notes completed a month prior should have already been in the file and submitted to the program manager for review. *Id.*; Defs.' 56.1 Stmt. ¶ 24. Ms. Inguanzo was advised that any further failure to complete case notes on time would cause a written warning to be issued. *Id.* Plaintiff rebuts Defendants' claims regarding the substance of the April 2010 disciplinary action by stating that she was unable to print from her computer for months due to problems with the office printer. Pl.'s 56.1 Counter-Stmt. ¶ 24.

Defendants contend that a counseling meeting was held between Plaintiff and Mr. Reardon, then her supervisor, following the issuance of the April 28, 2010 Disciplinary Action Form. Defs.' 56.1 Stmt. ¶ 25. According to Plaintiff, no such meeting was held. Pl.'s 56.1 Counter-Stmt. ¶ 25. However, on June 27, 2011, Ms. Inguanzo submitted an appeal request in which she acknowledged that she *did* meet with Mr. Reardon on April 28, 2010 to discuss the disciplinary action. *See* Defs. Ex. HH. In addition, in an April 29, 2010 email to Ms. Kimmerle, Mr. Reardon detailed the April 28, 2010 meeting with Ms. Inguanzo. *See* Defs. Ex. CC. In the email, Mr. Reardon stated, *inter alia*, that Ms. Inguanzo is "very difficult with any type of constructive criticism," and at first refused to sign the form. *Id.* Mr. Reardon also stated that Plaintiff had a problem with the reference to her notes being in the computer. *Id.* He noted that "[s]he informed me that the notes for March weren't even typed up yet. I then stated that was even a bigger problem . . . ." *Id.* According to Mr. Reardon, Plaintiff started to cry upon leaving the meeting, then proceeded to her desk and started taking papers off the walls, and tore them all and put them in her trash bin. *Id.* After Mr. Reardon approached Ms. Inguanzo and asked what she was doing, she angrily stated, "Nothing," and placed items from her office into a shopping

bag.  *Id.*  Ms. Inguanzo returned to work the next day, however, "calmer and in a better frame of mind."  *Id.*

In her second performance review, dated November 10, 2010, Ms. Inguanzo received a 4.00 overall score out of a possible 5.00, placing her in the 'Exceeds Expectations 3.50-4.49' performance level.  Defs. Ex. O.  According to the review, Plaintiff "[o]n occasion . . . falls behind on her case notes and service plans," which was noted during a recent audit.  *Id.*  The review referenced the April 2010 disciplinary action, but also noted that Ms. Inguanzo "has always taken on extra programmatic duties."  *Id.*  The review stated that the quality of Ms. Inguanzo's work is "good," and that she "demonstrates a terrific work ethic and puts a great deal of time into her work."  *Id.*

According to Defendants, Ms. Inguanzo was subsequently reminded in writing on more than one occasion of the importance of preparing the case notes on a timely basis.  Defs.' 56.1 Stmt. ¶ 45.  Specifically, after a February 2011 meeting with Ms. Inguanzo, Mr. Horton noted that they discussed how Ms. Inguanzo could improve on the timely submission of her progress notes, and that she agreed to put in time after work to address the issue.  *Id.*[6]  Plaintiff contends that this meeting addressed improvement regarding past performance, and cites to printer issues she was having from May 2010 through September 2010.  Pl.'s 56.1 Counter-Stmt. ¶ 45.[7]

---

[6] Though this supervision note appears to be dated January 18, 2011, the note was signed by Plaintiff on February 10, 2011.  *See* Pl.'s 56.1 Counter-Stmt. ¶ 45; Defs. Ex. P.

[7] Plaintiff further defends her performance by citing to the "multitude of job duties" she took on "over and above" what was required of her.  Pl.'s 56.1 Counter-Stmt. ¶ 26.  For example, in the absence of a program manager she collected client rent, covered caseloads, and reported on day-to-day activities to HSI's director of programs.  *Id.*; *see* Defs. Ex. O.

Defendants claim that the timeliness of case notes was addressed again in Plaintiff's 2011 performance review, which was issued on June 21, 2011.  Defs.' 56.1 Stmt. ¶ 46.[8]  According to Plaintiff, however, it was the timeliness of care plans, not case notes, that was at issue in this review.  Pl.'s 56.1 Counter-Stmt. ¶ 46.[9]  In the June 21, 2011 review, which Ms. Inguanzo did not sign, she received a 4.09 overall score out of a possible 5.00, again placing her in the 'Exceeds Expectations 3.50-4.49' performance level.  Defs. Ex. R.  According to the review, Plaintiff "is thorough and conscientious," and the quality of her work is "always within the guidelines of HSI practices."  *Id.*  However, the review went on to say that Ms. Inguanzo "is often late with her care plans," and that she does not appear to recognize the importance of the timely submission of her work and the negative impact that it could have on HSI's contract with HASA.  *Id.*

In July 2011, Ms. Inguanzo wrote a letter to Ada Tavares, HSI's Human Resources Manager, taking issue with her June 2011 performance evaluation.  Pl.'s 56.1 Counter-Stmt. ¶ 48.  Ms. Inguanzo charged that the criticism of the timeliness of her care plans and psychosocial treatment plans "ha[d] absolutely no substantiation and [was] completely false because [her] case files are always up to date in accordance with . . . contract regulations . . . ."  Defs. Ex. FF.

According to Defendants, two subsequent meetings were held with Plaintiff -- on July 18, 2011 and August 4, 2011 -- in which HSI supervisors addressed the importance of proper documentation and conveyed the expectation that care plans be completed on time.  Defs.' 56.1

---

[8] This was the third and final performance review Ms. Inguanzo received as an HSI employee.

[9] Plaintiff maintains that her care plans have never been late.  Pl.'s 56.1 Counter-Stmt. ¶ 46.

Stmt. ¶ 47.[10]  Ms. Inguanzo disputes this statement, and maintains that she stated in the July 18, 2011 meeting that her care plans and psychological assessments have never been late.  Pl.'s 56.1 Counter-Stmt. ¶ 47.  According to Defendant Kimmerle's notes for the July 18, 2011 meeting, Ms. Inguanzo said that she did not agree with the evaluation and that Mr. Horton should not have commented negatively about her late submission of care plans.  Defs. Ex. DD.  Ms. Kimmerle stated in response that her evaluation "was extremely good," but reminded Ms. Inguanzo that she had previously fallen behind on care plans.  *Id.*

Plaintiff further claims that the August 4, 2011 meeting did not concern the timeliness of care plans, but instead her characterization to co-workers of Mr. Horton as a "frustrated program manager."  Pl.'s 56.1 Counter-Stmt. ¶ 47.  According to Mr. Horton's notes for the meeting, he discussed Ms. Inguanzo's need to improve her critical listening skills, as well as her comment to fellow HSI employees that he was "one frustrated program manager."  Defs. Ex. DD.  However, the notes also reflect that Ms. Inguanzo was reminded of the importance of timely documentation, particularly care plans and psychosocial assessments.  *Id.*

Ms. Inguanzo took a vacation from late August to early September 2011.  Defendants contend that, prior to taking vacation, Ms. Inguanzo informed Mr. Horton that she had not completed five care plans and nine annual psychological assessments, which were all due within days of Plaintiff's vacation.  Defs.' 56.1 Stmt. ¶ 39.  According to Ms. Inguanzo, however, the five care plans and nine assessments only "required coverage."  Pl.'s 56.1 Counter-Stmt. ¶ 39.[11]

---

[10] The July 18, 2011 meeting was conducted by Ms. Kimmerle, Mr. Horton, and Ms. Tavares.  Mr. Horton was the only supervisor present for the August 4, 2011 meeting.  Pl.'s 56.1 Counter-Stmt. ¶ 22.

[11] In an August 26, 2011 communication to Mr. Horton, Ms. Inguanzo noted that the cases in question "will require coverage in order to meet the quality assurance of the program for September 2011 since I will be out of the office."  Defs. Ex. T.

To that end, Plaintiff requested a meeting with Mr. Horton to make arrangements regarding her workload. *Id.* Ms. Inguanzo claims that during this meeting she and Mr. Horton decided that they would split her workload while she was away. Pl. Ex. F; *see* Pl.'s 56.1 Counter-Stmt. ¶ 39.

### b. Backdating of Care Plans

According to Defendants, in October 2011 it was discovered that Plaintiff had backdated three client care plans. *Id.* ¶ 50.[12] On October 19, 2011, Mr. Horton sent an email to Ms. Inguanzo stating, "You have received the results of the 10/18/11 and 10/19/11 chart review of all your cases. I will perform another follow-up review on 10/26/11 and expect all deficiencies to be corrected at that time." Defs. Ex. U. According to Defendants, this communication served to alert Plaintiff to the problem of late care plans and advise of the upcoming review. Defs.' 56.1 Stmt. ¶ 51. In an email response to Mr. Horton, Plaintiff stated, "The date you placed on me is unrealistic but I will try my best." Defs. Ex. U.

On October 24, 2011, a Disciplinary Action Form was issued as a result of the late care plans. Defs.' 56.1 Stmt. ¶ 52; *see* Defs. Ex. Z. The form stated that it was a second notice, and that the violation related to repeated performance issues and violations of HSI's policies. *Id.* According to the form, Ms. Inguanzo was advised that three care plans were out of compliance with Human Resources Administration and HASA contractual guidelines as well as HSI standards. *Id.*

On October 25, 2011, Ms. Inguanzo turned in the three care plans with dates that preceded the date that Mr. Horton conducted the chart review and alerted her to the "deficiencies." Defs.' 56.1 Stmt. ¶ 53. Defendants claim that Mr. Horton asked Ms. Inguanzo to

---

[12] Defendants contend that it is HSI policy that care plans are created when the case manager and the tenant meet, and that care plans "are due on or prior to the due date." Defs.' 56.1 Stmt. ¶ 41.

put the correct date—the "dates when she had actually met, created and executed the documentation with the clients"—on the plans, but that Plaintiff refused. *Id.* ¶ 54. Defendants further contend that HSI reviewed computer metadata relating to the three care plans and determined that the plans were backdated suggesting that Plaintiff submitted "falsified records." *Id.* ¶ 55.

Plaintiff disputes Defendants' claims relating to the allegedly late care plans.[13] First, according to Ms. Inguanzo, dating the care plans as of the date of the client meeting, irrespective of when the form was actually executed, was the standard operating procedure at the Narragansett facility, which Plaintiff had been following throughout her employment. Pl.'s 56.1 Counter-Stmt. ¶ 50; *see id.* ¶ 41. In support of this claim, Plaintiff has submitted a sworn affidavit from her former co-worker Teronia Campbell, who states that HSI's standard practice was to date case plans as of the date of the client meeting. Pl. Ex. H.; *see* Pl.'s 56.1 Counter-Stmt. ¶ 50. Plaintiff claims that she dated the three care plans accordingly, but acknowledges that the clients did not sign them on those dates. *Id.*[14] Ms. Inguanzo further claims that she had submitted the care plans to Mr. Horton by October 19, 2011, and therefore that they were not

---

[13] Plaintiff also disputes that she had a documented problem with completing care plans in a timely fashion, and maintains that the April 2010 disciplinary form addresses case notes, not care plans. Pl.'s 56.1 Counter-Stmt. ¶ 44. As noted above, Plaintiff claims that she was unable to print from her computer in or around April 2010. *Id.* Ms. Inguanzo cites to several emails from late May 2010 to early September 2010 (postdating April 2010) as support for this claim. *See* Pl. Ex. B. In certain of these emails, Plaintiff stated that she has been using Mr. Reardon's computer at the end of each day in order to print documents. *Id.*

[14] Plaintiff provides two explanations why clients did not always sign care plans on the date of their meetings. First, Plaintiff notes that she was "backed up with work on those days," and clients would have to leave and come back within a day or two to sign the care plans. Pl.'s 56.1 Counter-Stmt. ¶ 50. Plaintiff further claims that clients would need to return to the office to sign care plans when there were network or printing problems at HSI, which was often the case. *Id.*

late.  *Id.* ¶¶ 53, 52.[15]  Ms. Inguanzo maintains that she communicated the same to Mr. Horton. *Id.* ¶ 54.

With regard to the metadata, Plaintiff claims that the "created date" refers to the last date on which the document was accessed, not the date on which the document was actually created. *Id.* ¶ 55.  For this proposition, Ms. Inguanzo cites Defendant Kimmerle's deposition testimony that the "created date" refers to the last day the file was accessed.  Kimmerle Tr. 85:20-23; *see* Pl.'s 56.1 Counter-Stmt. ¶ 55.

Finally, Plaintiff disputes that the October 24, 2011 Disciplinary Action Form was ever issued.  *Id.* ¶ 52.  Specifically, because Ms. Kimmerle's signature on the form is dated November 3, 2011, the date of Ms. Inguanzo's termination, Plaintiff claims to have never received the form. *Id.*

### c.  Requests for a Salary Increase

Ms. Inguanzo claims that Mr. Reardon promised her a pay raise when she was first hired at HSI.  Compl. ¶ 22.  However, she asserts that she never received the promised salary increase, and requested a pay raise on at least two occasions.  First, on May 6, 2011, she sent an email to Ms. Tavares to inquire about a raise.  Defs.' 56.1 Stmt. ¶ 27; *see* Defs. Ex. Q.  On May 9, 2011, Ms. Tavares advised that HSI had not had salary increases for the past 2 ½ years and that she was not sure if one would be granted that year.  *Id.*

Then, on July 1, 2011, Ms. Inguanzo wrote a letter to Ms. Kimmerle requesting a raise. Pl.'s 56.1 Counter-Stmt. ¶ 49; *see* Defs. Ex. EE.  Ms. Kimmerle addressed this communication in

---

[15] Plaintiff contends that because she had already submitted the three care plans to Mr. Horton for his review and signature on October 19, 2011, she did not believe Mr. Horton's email on that date related to those plans.  Pl.'s 56.1 Counter-Stmt. ¶ 51.  Instead, according to Plaintiff, she believed Mr. Horton's email regarded another deadline at the end of the month to have all of her work entered into a new case management system.  *Id.*  Plaintiff claims that it is for that reason that she expressed that the October 26, 2011 deadline was "unrealistic."  *Id.*

the July 18, 2011 meeting with Plaintiff, Mr. Horton, and Ms. Tavares.  At that time, according to Ms. Kimmerle's notes, she told Ms. Inguanzo "that based on the outstanding evaluation Mr. Horton gave her she would potentially receive a sizable increase."  Defs. Ex. DD; *see* Pl.'s 56.1 Counter-Stmt. ¶ 49.

Defendants claim that no HSI employee was given a salary increase during the entirety of Ms. Inguanzo's employment.  Defs.' 56.1 Stmt. ¶ 22.[16]  While Plaintiff disputes this assertion, *see* Pl.'s 56.1 Counter-Stmt. ¶ 27, her denial is contradicted by her earlier deposition testimony. In particular, Ms. Inguanzo testified that she "wouldn't know" whether any other case managers received a raise during the period of her employment, Inguanzo Tr. 35:8, and further testified that she did not know whether *any* HSI employee received a raise during her tenure.  *Id.* 37:24.

### d.  Program Manager Openings

During the course of Ms. Inguanzo's employment, two program manager positions became vacant.  Pl.'s 56.1 Counter-Stmt. ¶ 30.  The first was at the Narragansett facility where she worked, and the second at Scatter Site.  *Id.*  Defendants contend that Ms. Inguanzo did not formally apply for either position, although they acknowledge that she inquired about them. Defs.' 56.1 Stmt. ¶ 31.  According to Plaintiff, however, she attempted to apply for the positions but was prevented from doing so.  Pl.'s 56.1 Counter-Stmt. ¶ 31.  Ms. Inguanzo testified that she "did not apply by application" to the Narragansett position but "asked" Ms. Kimmerle about the position.  Inguanzo Tr. 45:11-17.  Similarly, Plaintiff testified that she "asked [Ms. Tavares] by e-mail" about the Scatter Site position.  *Id.* 46:10.

---

[16] For this contention, Defendants cite Ms. Kimmerle's deposition testimony that she, Mr. Horton, and Ms. Tavares explained to Plaintiff that no HSI employee had received a cost of living adjustment in over five years.  Kimmerle Tr. 48:16-19.  Ms. Inguanzo argues that Defendants have offered only Ms. Kimmerle's "self-serving statements" in support of this claim.  Pl.'s 56.1 Counter-Stmt. ¶ 22.

Specifically, on July 20, 2011, Plaintiff emailed Ms. Tavares, expressing her interest in the Scatter Site vacancy.  Pl.'s Ex. D.  Ms. Tavares replied the same day, saying that she would forward the request to Ms. Kimmerle.  *Id.*  On July 28, 2011, Ms. Inguanzo sent a follow-up email to Ms. Tavares, noting that she had not heard back from Human Resources.  *Id.*  Plaintiff stated that her skills and experience would be an "ideal match" for the position, and that she would send an updated resume and cover letter if necessary.  *Id.*  Ms. Tavares replied that the Scatter Site position had to be filled by a Licensed Master Social Worker ("LMSW"), and therefore Ms. Inguanzo could not be considered.  *Id.*

Plaintiff disputes that either program manager position required an LMSW.  Pl.'s 56.1 Counter-Stmt. ¶ 32.  Specifically, with respect to Narragansett, Plaintiff points out that Ms. Kimmerle testified that the contract with the funder for the facility does not require that its program manager possess a license.  Kimmerle Tr. 39:17.  However, Ms. Kimmerle testified that HSI itself determined to make that a requirement.  *Id.* 39:17-19.  In fact, HSI hired Mr. Horton—who at the time did not have a license—on the condition that he become an LMSW during a probationary period, which he did.  Defs.' 56.1 Stmt. ¶¶ 32, 36.[17]

With regard to Scatter Site, however, Defendants assert that the contract between HSI and the Human Resources Administration required that Scatter Site's manager be an LMSW. Defs.' 56.1 Stmt. ¶ 33.[18]  According to Defendants, Asha Smith was removed from the position of program manager at Scatter Site when this contractual requirement took effect because she

---

[17] Plaintiff contends that the only support for the fact that Mr. Horton was conditionally hired is Ms. Kimmerle's deposition testimony.  Pl.'s 56.1 Counter-Stmt. ¶ 36.

[18] Plaintiff challenges this statement on the basis that the Scatter Site contract refers to a "Program Director and not a Program Manager."  Pl.'s 56.1 Counter-Stmt. ¶ 33.

was not an LMSW.  *Id.* ¶ 34.  Sarah Stolfi, an LMSW, was hired as Ms. Smith's replacement.  *Id.* ¶ 35.[19]

It is undisputed that Plaintiff is not, and has never been, an LMSW.  *Id.* ¶ 19.

### e.   September 2011 Training Sessions

On September 14, 2011, Plaintiff was notified that Mr. Horton and a co-worker would be out of the office for a few hours the next day to attend training.  Defs. Ex. V; *see* Defs.' 56.1 Stmt. ¶ 42.  According to Defendants, the reason Plaintiff was not scheduled for this training was that she was on vacation the day the class was scheduled and was told another day would be arranged for her to attend this training.  *Id.*  Plaintiff contends that she should have been given the opportunity to attend the training session.  Pl.'s 56.1 Counter-Stmt. ¶ 42.

### f.   Allegedly Discriminatory Comments

According to Ms. Inguanzo, Ms. Kimmerle told her on more than one occasion that she could not find any qualified Hispanic social workers.  Pl.'s 56.1 Counter-Stmt. ¶ 57; *see* Inguanzo Tr. 106:16-19.[20]  According to Plaintiff's deposition testimony, Ms. Kimmerle made this comment twice, once at the Narragansett site and once at a Human Resources Administration office.  *Id.*  Ms. Inguanzo has not specified the timing of these statements.[21] Additionally, Plaintiff contends that Mr. Reardon told her that HSI promoted only those employees it "felt comfortable with in terms of race."  Pl.'s 56.1 Counter-Stmt. ¶ 57.

---

[19] Plaintiff argues that Defendants have offered only Ms. Kimmerle's testimony in support of these assertions.  Pl.'s 56.1 Counter-Stmt. ¶¶ 34, 35.

[20] Defendants claim that this is the only statement discussed in Plaintiff's testimony that "remotely addresses race."  Defs.' 56.1 Stmt. ¶ 58.

[21] The Complaint references only one occasion on which Ms. Kimmerle made this remark.  According to the Complaint, she made this statement when Ms. Inguanzo requested to be considered as Mr. Reardon's permanent replacement.  Compl. ¶ 40.

13

Ms. Inguanzo also claims that on July 18, 2011, Mr. Horton denied her request for vacation, telling her that she "needed to remain in the office to do what Mr. Horton considered to be 'woman's work' such as decorating and other manual labor." *Id.* However, when asked at her deposition whether Mr. Horton ever made any discriminatory comments to her, Ms. Inguanzo responded: "I believe when a program manager tells someone that you can't take vacation because you need someone to do *what I consider ladies' chores*, like clean the community room . . . help organize events, [and] to cover caseload . . . ." Inguanzo Tr. 212:21-25, 213:7-9 (emphasis added). There is no admissible evidence in the record that Mr. Horton ever told Plaintiff that she had to miss her vacation to do "woman's work."[22]

Defendants deny that any derogatory comments were made to Plaintiff about her gender, race, or national origin during her employment and point to Plaintiff's own testimony. Defs. Mem. L. 13. Ms. Inguanzo was asked repeatedly during her deposition whether anyone had ever made a derogatory statement *to her* based upon *her* gender, race, or national origin, and she did not identify any such statement.[23]

---

[22] It is worth noting that Mr. Horton allegedly made this comment the day before Ms. Inguanzo emailed Ms. Tavares to ask about accrued vacation days for August 2011.

[23] In her deposition, Plaintiff testified:

Q:  During the two and a half years that you worked at HSI, has anyone ever made a derogatory comment to you based upon your race, gender, and national origin?

A:  When I was interested in the position, Kristi Kimmerle stated that she couldn't find a Hispanic qualifying [*sic*] social worker for a program manager position.

. . .

Q:  The question was had anybody made a derogatory comment to you about your gender, your race, or your national origin?

A:  In regard to my gender and national origin and race, that information was revealed to Kristi Kimmerle in management when I first applied.

Q:  Again, that's not my question.

### g.  Ms. Inguanzo's Complaints of Discrimination

On August 8, 2011, James Dill, HSI's CEO, received a letter dated August 5, 2011, from Brandon Sipherd, then Ms. Inguanzo's counsel.  Pl.'s 56.1 Counter-Stmt. ¶ 61; *see* Defs. Ex. GG.  In the letter, Mr. Sipherd said that Ms. Inguanzo had been subjected to "acts of discrimination based on gender and national origin" which may be in violation of federal, state, and local statutes.  *Id.*  Mr. Sipherd's letter specified that the communication constituted a notice of intent to sue.  *Id.*

In a letter received by Ms. Tavares on October 14, 2011,[24] Ms. Inguanzo stated the belief that she has been discriminated against on the basis of her age[25] and gender.[26]  Defs. Ex. W; *see* Pl.'s 56.1 Counter-Stmt. ¶ 56.  In particular, Plaintiff wrote:

> During my employment I have witnessed less experienced employees than myself, being given promotions and salary increases while I have been passed over for both.  Most of the employees who have been offered promotions and pay increases by management [are] African American, White and male which I feel is highly unfair and discriminatory based on my gender and age. . . . As a Hispanic woman who is highly experience and qualified in my professional capacity as a case manager I feel that these actions by superiors represent a blatant form of unfair treatment and outright discrimination based upon my gender and nationality both of which are direct violations of equal opportunity regulations mandated by the government. . . . If the situation . . . cannot be rectified by management within a reasonable amount of time from the date of this [letter], I will have no recourse than to hire an attorney and pursue legal action against HSI

---

. . .

A:  Well, if someone in an authority position say you can't find a Hispanic qualifying [*sic*] social worker, that is to me, it reflects, you know, your race because I'm Puerto Rican, Hispanic.

Inguanzo Tr. 104:3-10, 104:14-21, 106:4-8.

[24] This letter, though received on October 14, 2011, was dated July 19, 2011.  Pl.'s 56.1 Counter-Stmt. ¶ 56.

[25] The Complaint does not contain any allegation of discrimination based on age or even specify Plaintiff's age.

[26] It is unclear why Ms. Inguanzo, having apparently retained an attorney, sent this letter under her own signature.

on the grounds of gender discrimination and harassment so that my legal rights
are protected.

*Id.* [27]

According to Defendant Kimmerle's testimony, Molly Mattimore, the Deputy Executive
Director of HSI, met with Ms. Inguanzo to discuss her complaints of discrimination.  Kimmerle
Tr. 49:8-11.  Neither party has provided any admissible evidence about the substance of this
conversation.

### h.  Treatment of Other HSI Employees

Defendants proffer that other female and Hispanic employees were highly regarded at
HSI and were promoted as appropriate.  First, Defendant Kimmerle, a supervisor who was
involved in the decisions to hire and fire Plaintiff, is a woman.  Ada Tavares is a Hispanic female
who was promoted from the position of case manager at HSI's Kenmore location to the head of
Human Resources for the organization.  Inguanzo Tr. 103:16-17, 107:3-12.  Johnny Chavez is a
Hispanic social worker who was promoted to a managerial position at HSI.  *Id.* 109:9-15.  Ms.
Inguanzo further testified that Ralph Garcia, a director of security at HSI, is Hispanic.  *Id.*
110:17-20.

Plaintiff has proffered evidence regarding the termination of other employees for the
falsification of records.  Specifically, according to Plaintiff, HSI terminated four other employees
for the falsification of records:  a Hispanic male case worker, a Hispanic male administrative

---

[27] Despite the assertions in her letter, and as stated above, Ms. Inguanzo testified in her deposition that she did not
know whether *any* HSI employee received a raise during her tenure.  Inguanzo Tr. 37:24.

staff worker, an African American male maintenance worker, and an African American female desk clerk.  *See* Pl. Ex. J.[28]

### i.  Plaintiff's Termination

Ms. Inguanzo was terminated on November 3, 2011.  Pl.'s 56.1 Counter-Stmt. ¶ 17. According to a November 3, 2011 Disciplinary Action Form, Ms. Inguanzo was terminated for repeated performance issues, violation of HSI policies, and "[b]ehavioral/[a]ttitude problems." Defs. Ex. AA.  The form stated that three care plans were submitted with dates preceding the original chart review date, and that Ms. Inguanzo refused to redo the care plans with corrected dates when so instructed by Mr. Horton.  *Id.*  Further, upon investigation it was determined that the care plans were backdated and that Ms. Inguanzo "falsified the signatory dates."  *Id.*

According to Defendants, Ms. Inguanzo was replaced by Daisy DeLaRosa, a Hispanic woman "believed to be of Puerto Rican national origin."  Defs.' 56.1 Stmt. ¶ 59.[29]  Ms. Kimmerle and Mr. Horton made the decision to hire Ms. DeLaRosa.  *Id.* ¶ 60.[30]

## II.  Procedural Background

Plaintiff filed an administrative charge against HSI with the NYSDHR on December 12, 2011.  Pl.'s 56.1 Counter-Stmt. ¶ 1.  On June 11, 2012, the NYSDHR issued a determination and Order After Investigation, finding no probable cause to believe that HSI engaged in

---

[28] On December 12, 2011, Plaintiff filed a charge with the New York State Division of Human Rights ("NYSDHR").  Compl. ¶ 52; *see* Answer ¶ 52.  Defendants provided the information regarding the other terminated employees in their position statement in that proceeding.  *See* Pl. Ex. J.

[29] Plaintiff disputes this statement on the basis that she is not in a position to know this information.  Pl.'s 56.1 Counter-Stmt. ¶ 59.  However, during proceedings before the New York State Division of Human Rights, Ms. Inguanzo "identifie[d] her replacement as Daisy DeLaRosa, [and] acknowledged [her] to be Hispanic, but of Dominican national origin."  Defs. Ex. B.

[30] Ms. Inguanzo disputes this statement based on a lack of personal knowledge, but notes that she "assumes" that Ms. Kimmerle and Mr. Horton hired Ms. DeLaRosa.  Pl.'s 56.1 Counter-Stmt. ¶ 60.

discrimination and dismissing Plaintiff's charge. *Id.* ¶ 2.  On August 17, 2012, the United States

Equal Employment Opportunity Commission ("EEOC") adopted the findings of the NYSDHR

and issued a Right to Sue Letter. *Id.* ¶ 3; Compl. ¶ 6.  Plaintiff commenced this action on

November 13, 2012.  Discovery closed on September 13, 2013. *See* Doc. 22.  The pre-motion

conference was held on October 2, 2013, and the instant motion was filed on November 8, 2013.

*See* Doc. 27.

### III. Summary Judgment Standard

#### a.  General Summary Judgment Standard

Summary judgment is appropriate where "the movant shows that there is no genuine

dispute as to any material fact."  Fed. R. Civ. P. 56(a).  "An issue of fact is 'genuine' if the

evidence is such that a reasonable jury could return a verdict for the non-moving party." *Senno*

*v. Elmsford Union Free Sch. Dist.*, 812 F. Supp. 2d 454, 467 (S.D.N.Y. 2011) (citing *SCR Joint*

*Venture L.P. v. Warshawsky,* 559 F.3d 133, 137 (2d Cir. 2009)).  A fact is "material" if it might

affect the outcome of the litigation under the governing law.  *Id.*  The party moving for summary

judgment is first responsible for demonstrating the absence of any genuine issue of material fact.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  If the moving party meets its burden, "the

nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue

of fact for trial in order to avoid summary judgment."  *Saenger v. Montefiore Med. Ctr.*, 706 F.

Supp. 2d 494, 504 (S.D.N.Y. 2010) (internal quotation marks omitted) (quoting *Jaramillo v.*

*Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008)).

In deciding a motion for summary judgment, the Court must "'construe the facts in the

light most favorable to the non-moving party and must resolve all ambiguities and draw all

reasonable inferences against the movant.'"  *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir.

2011) (quoting *Williams v. R.H. Donnelley, Corp.,* 368 F.3d 123, 126 (2d Cir. 2004)).  However, in opposing a motion for summary judgment, the non-moving party may not rely on unsupported assertions, conjecture or surmise.  *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995).   The non-moving party must do more than show that there is "some metaphysical doubt as to the material facts."  *McClellan v. Smith,* 439 F.3d 137, 144 (2d Cir. 2006) (internal quotation marks omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986)).  To defeat a motion for summary judgment, "the non-moving party must set forth significant, probative evidence on which a reasonable fact-finder could decide in its favor."  *Senno*, 812 F. Supp. 2d at 467-68 (citing *Anderson v. Liberty Lobby*, 477 U.S. 242, 256–57 (1986)).

### b.  Additional Summary Judgment Standards for Employment Discrimination Cases

Courts are cautious in granting summary judgment in employment discrimination cases where the employer's intent is at issue, *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008); however, "'[s]ummary judgment is appropriate even in discrimination cases, for . . . the salutary purposes of summary judgment—avoiding protracted, expensive and harassing trials—apply no less to discrimination cases than to other areas of litigation.'"  *Hongyan Lu v. Chase Inv. Servs. Corp.,* 412 F. App'x 413, 415 (2d Cir. 2011) (quoting *Weinstock v. Columbia Univ.,* 224 F.3d 33, 41 (2d Cir. 2000)).  Indeed, "'[i]t is now beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases.'"  *Feingold v. New York,* 366 F.3d 138, 149 (2d Cir. 2004) (quoting *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir. 2001)).  Furthermore, "[e]ven in the discrimination context, [] a plaintiff must provide more than conclusory allegations to resist a motion for summary judgment."  *Holcomb*, 521 F.3d at 137; *see also Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985).  A "nonmoving

19

party 'must offer some hard evidence showing that its version of the events is not wholly fanciful.'" *Jeffreys v. City of N.Y.*, 426 F.3d 549, 554 (2d Cir. 2005) (quoting *D'Amico v. City of N.Y.*, 132 F.3d 145, 149 (2d Cir. 1998)).

"[S]ummary judgment may not be granted simply because the court believes that the plaintiff will be unable to meet his or her burden of persuasion at trial.  There must either be a lack of evidence in support of the plaintiff's position or the evidence must be so overwhelmingly tilted in one direction that any contrary finding would constitute clear error." *Danzer v. Norden Sys., Inc.*, 151 F.3d 50, 54 (2d Cir. 1998) (citations omitted).  "Nonetheless, when an employer provides convincing evidence to explain its conduct and the plaintiff's argument consists of purely conclusory allegations of discrimination, the Court may conclude that no material issue of fact exists and it may grant summary judgment to the employer." *Walder v. White Plains Bd. of Educ.*, 738 F. Supp. 2d 483, 493 (S.D.N.Y. 2010) (citing *Budde v. H & K Distrib. Co.,* No. 99–9449, 216 F.3d 1071 (table), 2000 WL 900204, at *1 (2d Cir. June 29, 2000)).

### IV. Title VII Claims

Plaintiff alleges that Defendant HSI violated Title VII because it discriminated against her on the basis of race, gender, and national origin, as well as retaliated against her for complaining of the alleged discrimination.  Defendants argue that Plaintiff cannot carry her burden of proving discrimination under the standard articulated by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

#### a.  Legal Standard

Plaintiff's Title VII discrimination claim is properly analyzed under the three-step burden-shifting framework set forth in *McDonnell Douglas*.  Under the *McDonnell Douglas* framework, a plaintiff alleging a Title VII violation must first demonstrate a *prima facie* case of

discrimination.  *Id.* at 802.  The Second Circuit has explained that a plaintiff's burden at this

stage is minimal.  *Abdu-Brisson,* 239 F.3d at 467.  Nonetheless, in order to state a *prima facie*

case of discrimination, "a plaintiff must proffer some admissible evidence of circumstances that

would be sufficient to permit an inference of discriminatory motive," *Bennett v. Watson Wyatt &*

*Co.,* 136 F. Supp. 2d 236, 246 (S.D.N.Y. 2001), *aff'd,* 51 F. App'x 55 (2d Cir. 2002), and cannot

meet her burden through reliance on unsupported assertions.  *Goenaga v. March of Dimes Birth*

*Defects Found.,* 51 F.3d 14, 18 (2d Cir. 1995).  "Statements that are devoid of any specifics, but

replete with conclusions, are insufficient to defeat a properly supported motion for summary

judgment."  *Griffin v. Ambika Corp.,* 103 F. Supp. 2d 297, 308 (S.D.N.Y. 2000).  A plaintiff's

self-serving statement, without direct or circumstantial evidence to support the charge, is also

insufficient.  *Fincher v. Depository Trust & Clearing Corp.*, No. 06 Civ. 9959 (WHP), 2008 WL

4308126, *3 (S.D.N.Y. Sept. 17, 2008), *aff'd,* 604 F.3d 712 (2d Cir. 2010) (citing *Gonzales v.*

*Beth Israel Med. Ctr.*, 262 F. Supp. 2d 342, 353 (S.D.N.Y. 2003)).

 If a plaintiff successfully presents a *prima facie* case, the defendant must then rebut the

presumption of discrimination by offering legitimate and non-discriminatory reasons for the

adverse employment action demonstrated in plaintiff's *prima facie* case.  *Abdu-Brisson,* 239 F.3d

at 468 (citing *Tex. Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 254 (1981)).  The defendant's

burden at this step in the analysis is also "light."  *Greenway v. Buffalo Hilton Hotel,* 143 F.3d 47,

52 (2d Cir. 1998).  "The employer need not *persuade* the court that it was motivated by the

reason it provides; rather it must simply articulate an explanation that, if true, would connote

lawful behavior."  *Id.* (emphasis in original).

 "If the defendant carries this burden of production, the presumption raised by the *prima*

*facie* case is rebutted," and "drops from the case."  *Burdine*, 450 U.S. at 255, 255 n.10.  Under

the third step of the *McDonnell Douglas* framework, the burden then shifts back to the plaintiff to prove intentional discrimination by a preponderance of the evidence. *Abdu-Brisson*, 239 F.3d at 469. The plaintiff may meet her burden by demonstrating that the employer's proffered reason "was not the true reason for the employment decision," however, proof that the employer's proffered justification is false, however persuasive, "is simply one form of circumstantial evidence that is probative of intentional discrimination." *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 81 (2d Cir. 2001) (internal quotation marks and citations omitted). Instead, the plaintiff may rely on evidence—circumstantial or otherwise—demonstrating that "'an impermissible reason was a 'motivating factor,' without proving that the employer's proffered explanation' played no role in its conduct." *Id.* (quoting *Fields v. N.Y. State Office of Mental Retardation & Developmental Disabilities*, 115 F.3d 116, 120 (2d Cir. 1997)); *see also Cronin v. Aetna Life Ins. Co.*, 46 F.3d 196, 203 (2d Cir. 1995). Accordingly, although the plaintiff may carry her burden by presenting additional evidence showing that "the employer's proffered explanation is unworthy of credence," it "may often be carried by reliance on the evidence comprising the *prima facie* case, without more." *Cronin*, 46 F.3d at 203 (citations omitted). Thus, unless the employer has come forward with "evidence of a dispositive nondiscriminatory reason as to which there is no genuine issue and which no rational trier of fact could reject," the conflict between the plaintiff's evidence establishing a *prima facie* case and the employer's evidence of a legitimate, nondiscriminatory reason for the adverse employment action "reflects a question of fact to be resolved by the factfinder after trial." *Id.* (citing *Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 38 (2d Cir. 1994)).

### b. Discrimination Claim

To state a *prima facie* case of discrimination, a plaintiff must show that: (1) she is a

member of a protected class; (2) she was qualified for the position in question; (3) she suffered

an adverse employment action; and (4) the adverse action took place under circumstances giving

rise to an inference of discrimination.  *Ruiz v. Cnty. of Rockland*, 609 F.3d 486, 491-92 (2d Cir.

2010).

### i.   Failure to Promote

Plaintiff alleges that Defendant HSI failed to promote her to program manager at either

the Narragansett facility or Scatter Site despite the fact that she was qualified for each position.

To establish a discrimination claim based on the employer's failure to promote, a plaintiff must

demonstrate that (1) she is a member of a protected class; (2) she applied for and was qualified

for a job for which the employer was seeking applicants; (3) she was rejected for the position;

and (4) the position remained open and the employer continued to seek applicants having her

qualifications.  *Petrosino v. Bell Atl.*, 385 F.3d 210, 226 (2d Cir. 2004).  Defendants argue that

the failure to promote claim should be dismissed because Plaintiff never formally applied for

either position, and for the further reason that Ms. Inguanzo is not an LMSW.

In *Brown v. Coach Stores, Inc.*, 163 F.3d 706, 710 (2d Cir. 1998), the Second Circuit

established that a plaintiff must allege that he or she "applied for a specific position or positions

and was rejected therefrom, rather than merely asserting that on several occasions she or he

generally requested promotion."  Indeed, "[a] specific application is required 'to ensure[] that, at

the very least, the plaintiff employee alleges a particular adverse employment action, an instance

of alleged discrimination, by the employer.'"  *Petrosino*, 385 F.3d at 227 (quoting *Brown*, 163

F.3d at 710).  "Mere requests for consideration for promotion or general expressions of interest

over time do not suffice."  *Farzan v. Wells Fargo Bank, N.A.*, No. 12 Civ. 1217 (RJS) (JLC),

2013 WL 6231615, at *22 (S.D.N.Y. Dec. 2, 2013); *see also Sethi v. Narod*, No. 11-CV-2511

23

(MKB), 2014 WL 1343069, at *13 (E.D.N.Y. Apr. 2, 2014) ("[m]erely expressing an interest" in a position is insufficient to support a failure to promote claim).  However, as the Second Circuit has made clear, "the [specific application] rule is not inflexible.  The law recognizes that 'the facts of a particular case may sometimes make 'a specific application a quixotic requirement.'" *Petrosino*, 385 F.3d at 227 (quoting *Brown*, 163 F.3d at 710).

> a) *Scatter Site*

Ms. Inguanzo expressed her intent to apply for the Scatter Site position through a July 20, 2011 email to Ms. Tavares.  Pl. Ex. D.  On July 28, 2011, Ms. Inguanzo followed up with Ms. Tavares regarding the vacancy and offered to resend an updated resume and cover letter in order to be considered for the position.  *Id.*  These communications are sufficient to establish that Ms. Inguanzo applied for the Scatter Site position.  *Cf. Arroyo v. N.Y. Downtown Hosp.*, No. 07 CV 4275 (RJD) (LB), 2010 WL 3861071, at *4 (E.D.N.Y. Sept. 28, 2010) (finding that a jury could find that plaintiff applied for positions through emails expressing interest and follow-up conversations).

The record demonstrates, however, that Ms. Inguanzo was not qualified for the Scatter Site role because she is not an LMSW.  According to Defendants, as soon as the contract between HSI and the Human Resources Administration went into effect on January 5, 2011, the program manager at Scatter Site was required to be an LMSW.  Defs. Mem. L. 5.  *See* Defs. Ex. K.  In fact, Defendants note that as a result of this contractual requirement, Asha Smith, then the program manager at Scatter Site, was removed from the position because she was not an LMSW.  Defs.' 56.1 Stmt. ¶ 34; Defs. Mem. L. 5.  Sarah Stolfi, an LMSW, was hired to replace Ms. Smith.  *Id.*  Because she lacked the required license, Ms. Inguanzo was not qualified for the

Scatter Site position.[31]  Ms. Inguanzo is thus unable to establish a *prima facie* case of

discrimination on the failure to promote claim in connection with the Scatter Site position.

   b)  *Narragansett*

   Ms. Inguanzo has failed to present any evidence that she applied for the Narragansett

vacancy.[32]  Indeed, even though Plaintiff conflates the communications with Ms. Tavares

regarding Scatter Site as evidence that "Defendants nipped her attempts [to apply for the Scatter

Site and Narragansett positions] in the bud," Pl. Opp. Mem. L. 13, Plaintiff's emails to Ms.

Tavares, as well as Ms. Tavares' response, clearly reference only the Scatter Site position.  *See*

Pl. Ex. D.  Ms. Inguanzo acknowledged that she did not "apply by application" to the

Narragansett position.  Inguanzo Tr. 45:15.  The only admissible evidence in the record

concerning this position is Ms. Inguanzo's testimony that she asked about the vacancy.  That is

not sufficient to satisfy the application requirement.  *See Billups v. Dent Wizard Int'l Corp.*, No.

05 Civ. 9356 (DAB), 2010 WL 2541361, at *8 (S.D.N.Y. June 14, 2010) (stating that the

application requirement cannot be met with evidence that the employee generally requested a

promotion or expressed an interest in becoming a manager).  Moreover, based on Ms.

Kimmerle's testimony that HSI required an LMSW for the Narragansett position even though its

---

[31] *Cf. Ali v. Bank of N.Y.*, 934 F. Supp. 87, 94 (S.D.N.Y. 1996) (denying failure to promote claim where the job required a college degree, preferably in computer science, mathematics, or electrical engineering, and plaintiff did not have a college degree of any kind); *Silva v. Peninsula Hotel*, 509 F. Supp. 2d 364, 381 (S.D.N.Y. 2007) (holding that plaintiff failed to establish *prima facie* case of discrimination for failure to promote because all of defendant employer's technicians held college degrees in either computer science, electrical systems, or mechanical engineering, and plaintiff conceded that he had never taken a computer course or worked with computers and did not have a high school diploma).

[32] *See Jimenez v. City of New York*, 605 F. Supp. 2d 485, 497 (S.D.N.Y. 2009) ("Jimenez bears the burden of identifying the jobs for which he applied or for which he had an open application that was sufficiently denied. Statements that Jimenez applied for positions contained in Plaintiff's Local Rule 56.1 Statements [do] not suffice. Plaintiff must offer evidence, in the form of testimony (including his own) or documents that demonstrate he applied for the position in question.").

contract with the funder for the facility did not contain such a requirement, Plaintiff would not have been qualified for the role even if she had applied.  *See Thornley v. Penton Publ'g, Inc.*, 104 F.3d 26, 29 (2d Cir. 1997) (noting that "being qualified" for the purposes of the *prima facie* test refers to *the employer's* criteria for the position).  Accordingly, Ms. Inguanzo cannot establish a *prima facie* case because she presents no evidence that she applied for, or was qualified for, the Narragansett position.

Moreover, even if the Court were to find that Plaintiff had applied for and was qualified for the Narragansett position, any failure to promote claim based on this application would be time barred.  To bring a timely complaint under Title VII, an employee must file a charge with the EEOC within 180 days of the alleged discriminatory act, or file a charge with an equivalent state or city agency, such as the NYSDHR, within 300 days of the alleged discriminatory act.  *See Baird v. Kingsboro Psychiatric Ctr.*, No. 11 Civ. 159 (NGG) (LB), 2011 WL 9018127, at *4 (E.D.N.Y. Oct. 20, 2011), *adopted by*, 2012 WL 4057981 (E.D.N.Y. Sept. 13, 2012); 42 U.S.C. § 2000e-5(e)(1).  Here, the Complaint alleges that Mr. Reardon could no longer perform his duties as program manager as of July 2010, and that Mr. Horton was hired as his replacement in November 2010.  Compl. ¶¶ 39, 44.  Because Plaintiff filed the NYSDHR charge in December 2011, over 300 days after HSI allegedly discriminated against her by not promoting her at the Narragansett facility, any related Title VII claim would be time barred.  Accordingly, Plaintiff has failed to make out a *prima facie* case on the failure to promote claim in connection with the Narragansett position.

In sum, Plaintiff has failed to establish a *prima facie* case of employment discrimination in connection with either the Narragansett or Scatter Site jobs.  Defendants' motion for summary judgment on the Title VII failure to promote claim is therefore GRANTED.

26

ii.    **Failure to Receive a Salary Increase**

Plaintiff alleges that Defendants discriminated against her "by refusing to give her a promised raise." Compl. ¶ 2.  According to Plaintiff, Mr. Reardon promised her a raise upon her hiring.  *Id.*  ¶ 22.[33]  Plaintiff alleges that she reminded Ms. Kimmerle in a June 3, 2009 conversation that she had not yet received the promised salary increase.  *Id.* ¶ 25.  According to Plaintiff, Ms. Kimmerle stated in response that Ms. Inguanzo "would be the first in line to receive any such salary increase or promotion."  *Id.*  On March 7, 2011, Ms. Inguanzo repeated her request for the raise.  *Id.* ¶ 45.  Plaintiff claims that Ms. Kimmerle simply denied the request at that time.  *Id.*

Defendants argue that the claim that they discriminated against Ms. Inguanzo by failing to give her a raise must be dismissed because the undisputed evidence in the record establishes that *no one* at HSI received a raise during Plaintiff's tenure.  Plaintiff herself testified that she did not know of any HSI employee who received a raise during her employment, and she was explicitly told that no HSI employee received a raise during that period.  Def. Mem. L. 7; *see* Inguanzo Tr. 35:8, 37:24.  In addition, according to Ms. Kimmerle's testimony, no HSI employee received even a cost of living adjustment during Plaintiff's employment.  *See* Kimmerle Tr. 48:18-25.

"Failure to provide an employee with a raise may constitute an adverse employment

---

[33] The only evidence suggesting that Mr. Reardon ever promised Plaintiff a salary increase is her testimony that he once complimented her performance and stated, "after your performance review, you would get a raise, because there is money in the HASA contract for you to get a raise." Inguanzo Tr. 38:18-21.

Plaintiff makes no mention of this purported promise in either her May 9, 2011 email to Ms. Tavares inquiring about a salary increase or her July 1, 2011 communication to Ms. Kimmerle regarding consideration "for a salary increment."  *See* Defs. Ex. Q; Defs. Ex. EE.

action where Plaintiff can show that she was denied a salary increase received by similarly situated individuals as a result of discrimination." *Potash v. Fla. Union Free Sch. Dist.*, 972 F. Supp. 2d 557, 583 (S.D.N.Y. 2013); *see also Rooney v. Brown Grp. Retail, Inc.*, No. 08 CV 484 (DRH) (AKT), 2011 WL 1303361, at *11 (E.D.N.Y. Mar. 31, 2011).[34]  In *Rooney*, the court dismissed on summary judgment the plaintiff's claim that she was discriminated against on the basis of her pregnancy where her employer failed to provide a promised raise.  2011 WL 1303361, at *11.  There, the court noted that the plaintiff provided no evidence whatsoever that other managers, pregnant or not, received a pay raise before their annual review.  *Id.*  The court therefore concluded that plaintiff failed to demonstrate an adverse employment action "[w]ithout comparing herself in this way to other managers similarly situated."  *Id.*

Similarly, in *Potash*, the court dismissed on summary judgment the plaintiff's claim that she was "generally undercompensated" on the basis of her gender.  972 F. Supp. 2d at 582.  The plaintiff in *Potash* alleged that she had been told by her supervisors that she was underpaid, and this sentiment was supported when she "'started to learn about what other people were making,' and '*some* of them' were men."  *Id.* at 583 (internal citations omitted).  In part because the plaintiff failed to identify these other employees or their duties, the court could not conclude that they were similarly situated to plaintiff.  *Id.*  The court therefore found the plaintiff's allegations "plainly insufficient to establish a *prima facie* case."  *Id.*  As in *Rooney* and *Potash*, Ms. Inguanzo has failed to present any evidence that a similarly situated employee received a salary

---

[34] *See also Fullwood v. Ass'n for the Help of Retarded Children, Inc.*, No. 08 Civ. 6739 (DAB), 2010 WL 3910429, at *6 (S.D.N.Y. Sept. 28, 2010) (noting that the failure to provide a pay raise may constitute an adverse employment action under circumstances "where one is warranted" (quoting *Ebanks v. Neiman Marcus Grp.*, 414 F. Supp. 2d 320, 331 (S.D.N.Y. 2006))).

increase.[35]  Defendants' motion for summary judgment on the pay raise claim is therefore GRANTED.

   iii.   **Training Seminar**

Plaintiff alleges that Defendants intentionally precluded her from participating in the first part of a training seminar on the new Homeless Management Information System case management program.  *See* Pl. Opp. Mem. L. 7.[36]  Defendants claim that Plaintiff was not scheduled for the first training session because Ms. Inguanzo was on vacation the day HSI made arrangements for the training, and was subsequently told that another day would be arranged for her training.  Defs. 56.1 Stmt. ¶ 42.

In *Hill v. Rayboy-Brauestein*, 467 F. Supp. 2d 336, 352 (S.D.N.Y. 2006), the court noted that there is no adverse employment action when an employee cannot show material harm from a denial of training, such as a failure to promote or a loss of career advancement opportunities. *See also Trachtenberg v. Dep't of Educ.*, 937 F. Supp. 2d 460, 468 (S.D.N.Y. 2013) (same).[37] As in *Trachtenberg*, Ms. Inguanzo has not demonstrated any "negative consequences" resulting from the alleged denial of professional training, and therefore any "denial" of training here does not rise to the level of an adverse employment action.  937 F. Supp. 2d at 468.  Indeed, Plaintiff has failed to show that her absence from the first part of the training in any way affected her

---

[35] *Cf. Forsyth v. Fed'n Emp't & Guidance Serv.*, No. 97 Civ. 3399 (JSM), 2003 WL 41994, at *2 (S.D.N.Y. Jan. 6, 2003), *aff'd*, 409 F.3d 565 (2d Cir. 2005), *abrogated on other grounds*, *Ledbetter Goodyear Tire & Rubber Co.*, 550 U.S. 618 (2007) (finding that there was no basis on which a rational trier of fact could find that plaintiff was discriminated against where the allegedly similarly situated employees had more experience than plaintiff).

[36] It is undisputed that Plaintiff attended the second part of the training session.  *See* Compl. ¶ 62.

[37] *See also Kravitz v. New York City Transit Auth.*, No. 94-CV-5910 (NG), 2001 WL 1646513, at *6 (E.D.N.Y. Dec. 18, 2001), *aff'd*, 45 F. App'x 48 (2d Cir. 2002) (finding that plaintiff failed to raise genuine issues of material fact that defendant's failure to train plaintiff in computer programs constituted an adverse employment action because plaintiff "present[ed] no evidence, beyond his conclusory allegations, that he was harmed by not receiving training in these programs").

ability to perform her work or her opportunity for promotion.  Defendants' motion for summary judgment on the failure to train claim is therefore GRANTED.

### iv.    Plaintiff's Termination

Plaintiff's termination is undoubtedly an adverse employment action.  Defendants contend, however, that the circumstances under which Plaintiff was terminated do not give rise to an inference of discrimination.  An inference of discrimination "is a flexible standard that can be satisfied differently in differing factual scenarios."  *Moore v. Kingsbrook Jewish Med. Ctr.*, 11 Civ. 3625 (MKB), 2013 WL 3968748, at *6 (E.D.N.Y. July 30, 2013) (quoting *Howard v. MTA Metro–N. Commuter R.R.,* 866 F. Supp. 2d 196, 204 (S.D.N.Y. 2011) (brackets and internal quotation marks omitted)).  Additionally, "[n]o one particular type of proof is required to show that Plaintiff's termination occurred under circumstances giving rise to an inference of discrimination."  *Id.* (quoting *Ofoedu v. St. Francis Hosp. & Med. Ctr.,* 04 Civ. 1707 (PCD), 2006 WL 2642415, at *14 (D. Conn. Sept. 13, 2006)) (internal quotation marks omitted).  For example, an inference of discrimination can be drawn from an employer's "invidious comments about others in the employee's protected group; or the more favorable treatment of employees not in the protected group; or the sequence of events leading to the plaintiff's discharge."  *Id.* (quoting *Abdu–Brisson,* 239 F.3d at 468) (internal quotation marks omitted); *id.* (citing *Russell v. Cnty. of Nassau,* 696 F. Supp. 2d 213, 232 (E.D.N.Y. 2010) ("[A] discriminatory race and/or color motive can be inferred if a plaintiff was treated differently than similarly situated white employees or if the defendants engaged in a pattern of discriminatory treatment of African–American employees.").  The evidence Plaintiff offers in support of her claim cannot establish discrimination under Title VII as a matter of law.

a)  *Derogatory Comments*

Ms. Inguanzo cites four comments made over the course of her 32 months at HSI that she claims to be suggestive of discrimination against her.  Specifically, Plaintiff points to the two statements Ms. Kimmerle allegedly made regarding the "trouble" she was having finding a qualified Hispanic social worker, as well as Mr. Reardon's comment that HSI management promotes only those people "they feel comfortable with in terms of race."  *See* Inguanzo Tr. 106:12-19, 112:22-113:3.[38]  Ms. Inguanzo also cites Mr. Horton's alleged statement that he needed her to remain in the office to do "woman's work."  Pl. Opp. Mem. L. 4.  The admissible comments do not raise an inference of discrimination.

At the outset, stray comments are not evidence of discrimination if they are not temporally linked to an adverse employment action or if they are made by individuals without decision-making authority.  *Opoku-Acheampong v. Depository Trust Co.*, No. 99 Civ. 0774 (GBD), 2005 WL 1902847, at *3 (S.D.N.Y. Aug. 9, 2005); *see also Price Waterhouse v. Hopkins*, 490 U.S. 228, 278 (1989) (O'Connor, J., concurring), *superseded by statute as stated in Burrage v. United States*, 134 S. Ct. 881, 889 n.4 (2014) (noting that stray remarks and statements by decisionmakers that are unrelated to the "decisional process" do not give rise to an inference of discrimination); *Carlton v. Mystic Transp., Inc.*, 202 F.3d 129, 136 (2d Cir. 2000) ("Although evidence of one stray comment by itself is usually not sufficient proof to show age discrimination, that stray comment may 'bear a more ominous significance' when considered

---

[38] Defendants contend that the statement attributed to Mr. Reardon is time barred.  *See* Defs. Reply Mem. L. 8. While Defendants explain that a failure to promote is a discrete discriminatory act that requires the employee to file a charge with the state administrative agency within 300 days in order to preserve a Title VII claim, they do not state why Mr. Reardon's comment should not be considered evidence of discrimination here.  However, because the Court concludes that Plaintiff has presented insufficient evidence of discrimination to support a discrimination claim, we need not address this argument.  *Cf. Fleming v. MaxMara USA, Inc.*, 644 F. Supp. 2d 247, 263 n.13 (E.D.N.Y. 2009), *aff'd*, 371 Fed.Appx. 115, 117–18 (2d Cir.2010).

within the totality of all the evidence." (quoting *Danzer v. Norden Sys., Inc.*, 151 F.3d 50, 56 (2d

Cir. 1998)); *Schreiber v. Worldco, LLC*, 324 F. Supp. 2d 512, 518 (S.D.N.Y. 2004) (noting that

comments constitute evidence of discriminatory motivation when a plaintiff demonstrates a

nexus between the statements and a material adverse employment action).[39]

  Here, Plaintiff has failed to demonstrate any nexus between any of the comments made

and her termination from HSI.  As an initial matter, the statement attributed to Mr. Horton about

"woman's work" is nowhere supported in the record, and Ms. Inguanzo cites only the related

allegations in the Complaint.  In addition, while the statement was supposedly made in July

2011, with respect to Ms. Kimmerle's and Mr. Reardon's comments, Ms. Inguanzo's pleadings

suggest that they would have been made at least one year prior to Plaintiff's termination.[40]

  Moreover, it is unclear whether Ms. Kimmerle's or Mr. Reardon's statements were

directed at Plaintiff.  Indeed, when asked during her deposition if anyone at HSI had ever made a

derogatory comment to *her* based upon *her* gender, race, or national origin, Plaintiff did not

identify any such statement.  *See* note 23, *supra*.  In *Campbell v. Alliance National Inc.*, 107 F.

Supp. 2d 234, 247 (S.D.N.Y. 2000), the court dismissed on summary judgment a discrimination

---

[39] *See also O'Connor v. Viacom Inc.*, No. 93 Civ. 2399, 1996 WL 194299, at *5 (S.D.N.Y. Apr. 23, 1996) (three isolated remarks by supervisor insufficient to establish pretext where plaintiff could not demonstrate nexus between comments and her termination); *Ezold v. Wolf, Block, Schorr & Solis-Cohen*, 983 F.2d 509, 545 (3d Cir. 1992) (noting that stray remarks by non-decisionmakers or by decisionmakers unrelated to the decision process are "rarely given great weight," particularly if they are not temporally connected to adverse employment actions).

[40] According to the Complaint, Mr. Reardon's comment was made in late 2009.  Compl. ¶ 29.  With regard to Ms. Kimmerle's statement, the Complaint alleges that the comment was made when Ms. Inguanzo requested to be considered as Mr. Reardon's replacement, which would have been between the time Mr. Reardon stopped working in July 2010 and Mr. Horton was hired in November 2010.  Compl. ¶ 40.  Ms. Inguanzo similarly testified that the comment was made when Plaintiff was interested in the Narragansett position.  Inguanzo Tr. 104:7-10.  Plaintiff further testified that Ms. Kimmerle's statement was made twice, once at the Narragansett and once at the Human Resources Administration.  *Id.* 106:16-19.  Ms. Inguanzo does not otherwise specify the timing of Ms. Kimmerle's statements.

claim where the plaintiff testified that a supervisor told her not to hire anyone for the receptionist position who was "not light-skinned or who had an accent, braids, big earrings or nose rings." *Id.* The court concluded that, even assuming the truth of the accusation, the statement was, *inter alia*, remote in time and isolated; did not relate to the decision to terminate the plaintiff's employment; and was made by a non-decisionmaker. *Id.* So too here, these were "the kind of isolated and stray remark[s] that [are] insufficient to establish . . . animus and defeat a motion for summary judgment." *Id.*

b)  *Similarly Situated Co-Workers*

Defendants correctly note that Plaintiff has not presented any evidence of a similarly situated case manager who was treated more favorably than she was. Defs. Mem. L. 11. As the Second Circuit has made clear, "[a] showing of disparate treatment—that is, a showing that an employer treated plaintiff 'less favorably than a similarly situated employee outside his protected group'—is a recognized method of raising an inference of discrimination for the purposes of making out a prima facie case." *Mandell v. Cnty. of Suffolk*, 316 F.3d 368, 379 (2d Cir. 2003) (quoting *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000)). An employee is similarly situated to co-employees if they were (1) subject to the same performance evaluation and discipline standards, and (2) engaged in comparable conduct. *Ruiz v. Cnty. of Rockland*, 609 F.3d 486, 493-94 (2d Cir. 2010) (quoting *Graham*, 230 F.3d at 40). To be "similarly situated," the individuals with whom the plaintiff attempts to compare herself must be similarly situated in all material respects. *Shumway v. United Parcel Serv., Inc.*, 118 F.3d 60, 64 (2d Cir. 1997). Ms. Inguanzo has failed to point to any similarly situated employee, not in a protected class, who was not terminated despite having a documented history of filing untimely case notes and care plans, being insubordinate, or being accused of falsifying documents.

33

Additionally, while Plaintiff contends that it is "very telling" that the four other employees terminated for the falsification of records were African American or Hispanic, Pl.'s 56.1 Counter-Stmt. ¶ 57; *see also* Pl. Opp. Mem. L. 4, given that two of the four individuals were African American, and three of the four employees male, the termination of these employees does not necessarily cut in Plaintiff's favor.  This is particularly so in light of the fact that in her July 19, 2011 letter to Ms. Tavares, Plaintiff asserts that "*African American*, White, and male" employees had received favorable treatment at HSI.  Defs. Ex. W (emphasis added).  Finally, if anything, the termination of these employees[41] supports Defendants' argument that HSI adheres to its written code of conduct by firing employees who falsify records, regardless of their sex, national origin, or race.  *See* Defs. Mem. L. 7.

> c) *Ms. Kimmerle's Involvement in Plaintiff's Hiring and Firing*

Plaintiff's *prima facie* case is further weakened by the fact that the record demonstrates that Defendant Kimmerle, a woman, was involved in the decisions to hire and fire Plaintiff. Defs.' 56.1 Stmt. ¶¶ 14, 18; *see* Defs. Mem. L. 13.  "When the same actor hires a person already within the protected class, and then later fires that same person, 'it is difficult to impute to her an invidious motivation that would be inconsistent with the decision to hire.'"  *Carlton*, 202 F.3d at 137 (quoting *Grady v. Affiliated Cent., Inc.*, 130 F.3d 553, 560 (2d Cir. 1997)); *see also Ruane v. Cont'l Cas. Co.*, No. 96 Civ. 7153 (LBS), 1998 WL 292103, at *8 (S.D.N.Y. June 3, 1998) ("[T]he underlying rationale for the [same actor] inference is simple:  it is suspect to claim that the same manager who hired a person in the protected class would suddenly develop an aversion to members of that class.").

---

[41] Defendants state that the four employees were terminated for the falsification of case notes, work orders, time sheets, and logs, respectively.  Defs. Mem. L. 7.

In the Second Circuit, there is a strong inference that discrimination was not a motivating factor in an employment decision where the plaintiff's termination "occurs within a relatively short time after [her] hiring." *Carlton*, 202 F.3d at 137. Because Ms. Inguanzo was an HSI employee for over two years, it is unclear whether the same actor inference is applicable here. *See Dellaporte v. City Univ. of N.Y.*, 998 F. Supp. 2d 214 (S.D.N.Y. 2014) (noting that the inference is particularly strong because plaintiff was fired less two years after his hiring); *Thomas v. iStar Fin., Inc.*, 438 F. Supp. 2d 348, 361 (S.D.N.Y. 2006), *aff'd*, 629 F.3d 276 (2d Cir. 2010) ("[T]he same actor inference does not apply when considerable time has passed between the hiring and firing. In the Second Circuit, the inference no longer applies when more than two years separate the hiring and firing."); *Gue v. Suleiman*, No. 10 Civ. 8958 (RLE), 2012 WL 4473283, at *5 (S.D.N.Y. Sept. 27, 2012) (relying on *Thomas* for the conclusion that the "viability of the inference" was undermined because of the approximately three years between plaintiff's hiring and firing).

Regardless of whether the same actor inference applies, however, courts recognize that an allegation that a decision was motivated by a discriminatory animus is weakened when a decisionmaker is a member of the same protected class as the plaintiff. *Moore*, 2013 WL 3968748, at *11 (collecting cases); *see also Fosen v. N.Y. Times*, No. 03-CV-3785 (KMK) (THK), 2006 WL 2927611, at *5 (S.D.N.Y. Oct. 11, 2006) (noting that any inference of discrimination was "critically undermined" by the fact that the supervisors responsible for plaintiff's termination were also women); *White v. N.Y.C. Dep't of Educ.*, 05 Civ. 2064 (RRM) (LB), 2008 WL 4507614, *6 (E.D.N.Y. Sept. 30, 2008) (the fact that the denial of additional resources came from plaintiff's own African–American supervisor, a female teacher in the same protected class as plaintiff, rendered plaintiff's "speculative and conclusory claims of racial,

ethnic or gender prejudice even less plausible."). Accordingly, Ms. Kimmerle's involvement in Ms. Inguanzo's hiring and firing makes any inference of discrimination less plausible.

        d)  *HSI's Treatment of Other Hispanic Workers*

Moreover, it is undisputed that HSI has Hispanic employees in high ranking positions: Ada Tavares, a Hispanic female, is HSI's head of human resources; Johnnie Chavez, a Hispanic social worker, was promoted to a managerial position at HSI, *see* Pl.'s 56.1 Counter-Stmt. ¶ 43; Ralph Garcia is a director of security. Inguanzo Tr. 110:17-20. Plaintiff's argument that discrimination played a role in her termination is therefore weakened by such evidence. *Cf. Wood v. Sophie Davis Sch.*, No. 02 Civ. 7781 (HB), 2003 WL 22966288, at *4 (S.D.N.Y. Dec. 15, 2003) ("And, any assertion by plaintiff of a broad-based discriminatory payment system is weakened by the reality, acknowledged by plaintiff, that three other African-American employees in the same series as plaintiff, though admittedly in positions one step higher than plaintiff, received higher salaries than plaintiff for duties that *plaintiff considered* to be less demanding."); *Sealy v. Hertz Corp.*, 688 F. Supp. 2d 247, 256-57 (S.D.N.Y. 2009) (ruling that plaintiff failed to raise an inference of discrimination where defendant promoted two other African American employees).

Finally, Ms. Inguanzo was replaced by Daisy DeLaRosa, a Hispanic woman. Defs.' 56.1 Stmt. ¶ 59. "Where a member of the plaintiff's protected class is contemporaneously hired as a replacement, the offering of 'proof of intentional discrimination appears extremely difficult, if not practically impossible.'" *Fleming v. MaxMara USA, Inc.*, 644 F. Supp. 2d 247, 261 (E.D.N.Y. 2009), *aff'd,* 371 Fed.Appx. 115, 117–18 (2d Cir.2010) (quoting *Estepa v. Shad*, 652 F. Supp. 567, 571 n.5 (E.D.N.Y. 1987)); *see also Umansky v. Masterpiece Int'l, Ltd.*, No. 96 Civ. 2367 (AGS), 1998 WL 433779, at *3 (S.D.N.Y. July 31, 1998) ("[T]he fact that plaintiff was

replaced by another white female weighs heavily against an inference that she was discriminated against as a white female."); *Montanile v. Nat'l Broad. Co.*, 211 F. Supp. 2d 481, 487 (S.D.N.Y. 2002) (noting that the replacement of a plaintiff with another employee in same protected class weighs heavily against inference of discrimination); *Randolph v. CIBC World Mkts.*, No. 01 Civ. 11589 (RWS), 2005 WL 704804, at *12 (S.D.N.Y. Mar. 29, 2005) (finding that the plaintiff failed to establish a *prima facie* case of disparate treatment in part because he was replaced by an individual in the same protected class); *Bampoe v. Coach Stores, Inc.*, 93 F. Supp. 2d 360, 371 (S.D.N.Y. 2000) (noting that plaintiff's failure to show that his job was ultimately filled by a person outside plaintiff's protected class "undermines his attempt to establish a *prima facie* case of Title VII discrimination").

While it is true that the Second Circuit has rejected the *per se* rule followed in other circuits that a plaintiff must demonstrate that she was replaced by a person outside the protected class, *Umansky*, 1998 WL 433779, at *3 (citing *Meiri v. Dacon*, 759 F.2d 989, 995-96 (2d Cir. 1985)), the hiring of Ms. DeLaRosa, a Hispanic woman,[42] to replace Plaintiff—in light of the other evidence—severely undercuts Plaintiff's Title VII claim.  In *DeJesus v. District One Community Education Council*, No. 08 Civ. 10666 (GBD), 2010 WL 3959624, at *4 (S.D.N.Y. Sept. 14, 2010), the court concluded that the plaintiff failed to establish a *prima facie* case of discrimination on the basis of her race, national origin, and gender where her replacement was also a Hispanic African-American female of Puerto Rican descent.  As the court in *DeJesus*

---

[42] While Defendants have not presented evidence to confirm Ms. DeLaRosa's national origin, there is no dispute that she is a Hispanic female.  *See* Kimmerle Tr. 70:19; Defs. Ex. B.

Defendant Kimmerle's testimony in this regard is speculative:  "I don't want to guess.  I think she's Puerto Rican, maybe.  I think Puerto Rican.  I'm not sure."  Kimmerle Tr. 70:21-23.  Plaintiff, however, has failed to offer any evidence of discrimination specific to her national origin.  Accordingly, Defendants' failure to proffer evidence of Ms. DeLaRosa's national origin is of no significance.

stated, "[t]he fact that plaintiff's immediate replacement is of the same protected classes effectively precludes plaintiff from establishing that her termination occurred under the requisite circumstances giving rise to an inference of discrimination." *Id.* Accordingly, in light of the facts in the record, the Court finds that Plaintiff has not raised an inference of discrimination.

e) *Poor Performance Reviews*

Ms. Inguanzo's protestations regarding the timeliness of her client records and work performance also do not give rise to an inference that Defendants' conduct was motivated by bias. Ms. Inguanzo's disagreement with her employer's evaluation of her behavior or performance is not evidence of discriminatory intent as a matter of law. *Jimoh v. Ernst & Young,* 908 F.Supp. 220, 226 (S.D.N.Y.1995) (citing *Dister v. Cont'l Grp.,* 859 F.2d 1108, 1116 (2d Cir.1988)). "While plaintiff argues that her behavior during the incidents cited by defendants was appropriate and justified, a plaintiff's factual disagreement with the validity of an employer's non-discriminatory reason for an adverse employment decision does not, by itself, create a triable issue of fact." *Fleming,* 644 F.Supp.2d at 266; *see also Martinez v. Conn. State Library,* 817 F.Supp.2d 28, 47 (D.Conn.2011) ("[T]he fact that [plaintiff] disagreed with Defendant's conclusion that her behavior during the bathroom incident was inappropriate and violated the Workplace Violence Policy is alone insufficient to create a triable issue of fact."). Even if Defendants did exaggerate or lie about Ms. Inguanzo's conduct or performance, there is no evidence in the record to support a finding that they did so in order to conceal any prohibited motivation based on her gender, race, or national origin. *Grillo v. N.Y. City Transit Auth.,* 291 F.3d 231, 235 (2d Cir.2002); *see also Duclair v. Runyon,* 166 F.3d 1200, 1998 WL 852867, at *3 (2d Cir.1998) (concluding that the plaintiff failed to establish a *prima facie* case of

38

discrimination when the evidence showed that the plaintiff's supervisor disliked him personally but never made a derogatory racial or ethnic remark).

For the reasons stated above, Plaintiff has failed to establish a *prima facie* case of discrimination.[43]  Defendant's motion for summary judgment on the Title VII discrimination claim is therefore GRANTED.[44]

### c.  Retaliation Claim

Plaintiff claims that HSI executives retaliated against her because she complained that she was subjected to unlawful discrimination.

To establish a *prima facie* case of retaliation under Title VII, an employee must show that:  (1) she was engaged in a protected activity; (2) the defendant was aware of the protected activity; (3) she suffered a materially adverse action; and (4) there is a causal connection between her protected activity and the materially adverse action.  *Lore v. City of Syracuse*, 670

---

[43] The Complaint alleges that Mr. Horton denied Ms. Inguanzo's request for vacation on July 18, 2011.  *See* Compl. ¶ 50.  To the extent Plaintiff attempts to argue that this constitutes a material adverse employment action, such a claim necessarily fails because a one-time denial of a vacation request is *not* a materially adverse employment action.  *See Hunter v. St. Francis Hosp.*, 281 F. Supp. 2d 534, 544 (E.D.N.Y. 2003); *Roff v. Low Surgical & Med. Supply, Inc.*, No. CV-03-3655 (SJF) (JMA), 2004 WL 5544995, at *4 (E.D.N.Y. May 11, 2004).

[44] Even if the Court were to find that Plaintiff established a *prima facie* case of discrimination, the Title VII claim would still fail.  Specifically, Defendants would be able to meet their burden of offering legitimate and non-discriminatory reasons for Plaintiff's termination.  The record supports Defendants' claim that Ms. Inguanzo, who had previously been disciplined for the late submission of client documents, was terminated for the falsification of client records.  Accordingly, Plaintiff would then be required to prove intentional discrimination by a preponderance of the evidence.  *See Abdu-Brisson*, 239 F.3d at 469.  Ms. Inguanzo would not be able to carry her burden under this standard, however.  In particular, Plaintiff has failed to present evidence that demonstrates that Defendants' proffered reason for her termination was pretextual.  *See Weinstock*, 224 F.3d at 42 ("To get to the jury, '[i]t is not enough . . . to disbelieve the employer; the factfinder must [also] believe the plaintiff's explanation of intentional discrimination.'" (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 519 (1993)); *cf. Lu v. Chase Inv. Servs. Corp.*, 412 F. App'x 413, 418 (2d Cir. 2011) (noting that even assuming plaintiff could establish *prima facie* case of discrimination, the claim would still fail because she did not present plausible evidence suggesting that the legitimate, nondiscriminatory reasons advanced by her employer were a pretext for discrimination).  Therefore, the Court would still rule in Defendants' favor even if Plaintiff had successfully presented a *prima facie* case of discrimination.

F.3d 127, 157 (2d Cir. 2012).  While a protected activity generally involves the filing of a

lawsuit or a formal complaint of discrimination with an administrative agency, *Kotcher v. Rosa*

*& Sullivan Appliance Ctr., Inc.*, 957 F.2d 59, 65 (2d Cir. 1992), the Second Circuit has

recognized that "protected activity" may also include "informal protests of discriminatory

employment practices, including making complaints to management."  *Sumner v. U.S. Postal*

*Serv.,* 899 F.2d 203, 209 (2d Cir. 1990).   Additionally, a plaintiff may establish the causal

connection requirement either directly, by offering evidence of retaliatory animus, or indirectly,

by demonstrating that the protected activity was followed in close proximity by the adverse

treatment.  *Id.* at 209.  "The cases that accept mere temporal proximity between an employer's

knowledge of protected activity and an adverse employment action as sufficient evidence of

causality to establish a prima facie case uniformly hold that the temporal proximity must be

'very close.'"  *Clark Cnty. Sch. Dist. v. Breeden,* 532 U.S. 268, 273 (2001) (citation omitted); *see*

*also Gorman-Bakos v. Cornell Coop. Extension of Schenectady Cnty.,* 252 F.3d 545, 554 n.5,

554-55 (2d Cir. 2001) (collecting cases); *Woods v. Enlarged City Sch. Dist. of Newburgh,* 473 F.

Supp. 2d 498, 528-29 (S.D.N.Y. 2007) (same), *aff'd*, 288 F. App'x 757 (2d Cir. 2008).

### i.     Protected Activity

Plaintiff contends that the two letters she sent to HSI executives in 2011 qualify as

protected activity.  Pl. Opp. Mem. L. 16.[45]  First, in a letter dated August 5, 2011, Ms.

Inguanzo's counsel complained of "acts of discrimination based on gender and national origin"

and provided notice of Plaintiff's intent to sue.  *See* Defs. Ex. GG.  According to Defendants, this

letter is insufficient because it does not set forth the discrimination claim with any specificity.

---

[45] Plaintiff does not argue that she was retaliated against for the filing of the NYSDHR charge on December 12, 2011, well over a month *after* she was terminated.  Defs. Mem. L. 17; *see* Pl. Opp. Mem. L. 15-17.

Defs. Mem. L. 18.  Second, in the letter to Ms. Tavares, which was received on October 14,

2011, Ms. Inguanzo claimed that she had been discriminated against on the basis of age and

gender.  *See* Defs. Ex. W.  Defendants argue that while the letter to Ms. Tavares claimed

discrimination on the basis of age and gender and also mentions race, "[t]he crux of the

complaint is the lack of a raise and promotion."  Defs. Mem. L. 18-19.

       "The term 'protected activity' refers to action taken to protest or oppose statutorily

prohibited discrimination."  *Bryant v. Verizon Commc'ns Inc.*, 550 F. Supp. 2d 513, 537

(S.D.N.Y. 2008).  "The onus is on the speaker to clarify to the employer that he is complaining

of unfair treatment due to his membership in a protected class and that he is not complaining

merely of unfair treatment generally."  *Aspilaire v. Wyeth Pharm., Inc.*, 612 F. Supp. 2d 289,

308-09 (S.D.N.Y. 2009).  However, complaints about conduct clearly prohibited by the statute

need not mention discrimination or use particular language.  *Int'l Healthcare Exch., Inc. v.*

*Global Healthcare Exch., LLC*, 470 F. Supp. 2d 345, 357 (S.D.N.Y. 2007).  Indeed, "[w]hile

there are no magic words that must be used when complaining about a supervisor, in order to be

protected activity the complainant must put the employer on notice that the complainant believes

that discrimination is occurring."  *Ramos v. City of New York*, No. 96 Civ. 3787 (DLC), 1997

WL 410493, at *3 (S.D.N.Y. July 22, 1997); *see also Ellis v. Century 21 Dep't Stores*, 975 F.

Supp. 2d 244, 280 (E.D.N.Y. 2013) (noting that a plaintiff must make a complaint in

"'sufficiently specific terms so that the employer is put on notice that the plaintiff believes he or

she is being discriminated against on the basis of race, gender, or national origin.'" (quoting

*Brummell v. Webster Cent. Sch. Dist.*, No. 06-cv-6437, 2009 WL 232789, at *6 (W.D.N.Y. Jan.

29, 2009)).

Here, the August 5, 2011 letter stated in no uncertain terms Ms. Inguanzo's belief that she was the victim of discrimination based on her gender and national origin.  In the second letter, Ms. Inguanzo stated her feeling—"[a]s a Hispanic woman who is highly experienced and qualified"—that alleged promotions and pay increases offered to "African American, White and male" employees represented a "blatant form of outright discrimination based upon my gender and nationality."  Defs. Ex. W.  These complaints clearly put Defendants on notice that Ms. Inguanzo was asserting discrimination on the basis of race, gender, and national origin, and are therefore sufficient to establish protected activity under the first prong of the *prima facie* test. *Cf. Marks v. Nat'l Commc'ns Ass'n, Inc.*, 72 F. Supp. 2d 322, 338 (S.D.N.Y. 1999) (finding that plaintiff failed to "couch" her complaint in terms of gender discrimination and there was therefore nothing that could have led her employer to understand that her objections were gender-based); *Rommage v. MTA Long Island R.R.*, No. 08-cv-836 (DLI) (ALC), 2010 WL 4038754, at *14 (E.D.N.Y. Sept. 30, 2010) (stating that there was no reason to impute to defendant any consciousness of a race or gender premise underlying harassment described in complaint letter where the letter addressed harassment generally and did not contain an obvious reference to race or gender).

**ii.  Employer Knowledge**

In order to satisfy the requirement of employer knowledge, an employee must have made it clear that she was opposing activity made illegal by Title VII.  *Galdieri-Ambrosini*, 136 F.3d at 292.  To satisfy this requirement, a plaintiff is not required to show that the individual decision-makers had knowledge of her protected activity; it is sufficient if the corporate entity has been put on notice of plaintiff's complaint of conduct violating Title VII.  *Gordon*, 232 F.3d at 116; *see also Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 844 (2d Cir. 2013) (noting that the

42

Second Circuit does not require anything more than general corporate knowledge that a plaintiff has engaged in protected activity).

The Second Circuit has established that general corporate knowledge is sufficient to satisfy the second element of a *prima facie* case of retaliation.  *Id.*  An individual decision-maker's lack of knowledge of Ms. Inguanzo's protected activity does not undermine HSI's knowledge of her letters.  *Alston v. N.Y. City Transit Auth.*, 14 F. Supp. 2d 308, 311 (S.D.N.Y. 1998) (citing *Reed v. A.W. Lawrence & Co.*, 95 F.3d 1170, 1178 (2d Cir. 1996)).  Because knowledge of employees tasked with investigating and evaluating claims of discrimination is sufficient to show corporate knowledge, Plaintiff's letters to HSI's CEO and Human Resources Manager were certainly sufficient under this standard.  *Moccio v. Cornell Univ.*, 889 F. Supp. 2d 539, 585 (S.D.N.Y. Aug. 27, 2012).  Accordingly, the second element of a *prima facie* case of retaliation is satisfied by Ms. Inguanzo's correspondence.

### iii.    Materially Adverse Employment Action

For the reasons stated above, p. 30 *supra*, Plaintiff's termination qualifies as a material adverse employment action for the purposes of the retaliation claim.

### iv.    Causation

In *University of Texas Southwestern Medical Center v. Nassar*, 133 S. Ct. 2517 (2013), the Supreme Court "recently held that 'Title VII retaliation claims must be proved according to traditional principles of but-for causation,' which 'requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer.'"  *Zann Kwan*, 737 F.3d at 845 (quoting *Nassar*, 133 S. Ct. at 2533).  However, as the Second Circuit noted in *Zann Kwan*, "the but-for causation standard does not alter the plaintiff's

ability to demonstrate causation at the prima facie stage on summary judgment or at trial indirectly through temporal proximity." *Id.*

Here, Plaintiff has failed to present any direct or circumstantial evidence reflecting retaliatory motive.  However, at the *prima facie* stage, a plaintiff can rely solely on temporal proximity to establish the requisite causal connection between her protected activity and the materially adverse action that she allegedly suffered in retaliation for engaging in that activity. *See Tu v. OppenheimerFunds, Inc.*, No. 10 Civ. 4971 (PKC), 2012 WL 516837, at *10 (S.D.N.Y. Feb. 16, 2012).  Given that HSI became aware of Plaintiff's complaints in August and October 2011, and Ms. Inguanzo's termination occurred in November 2011, the temporal relationship between the protected activity and Ms. Inguanzo's termination would—under normal circumstances—be sufficiently proximate to support an inference of causation.  *See Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 110 (2d Cir. 2010) ("Though this Court has not drawn a bright line defining, for the purposes of a prima facie case, the outer limits beyond which a temporal relationship is too attenuated to establish causation, we have previously held that five months is not too long to find the causal relationship.").  However, as the Second Circuit made clear in *Slattery v. Swiss Reinsurance America Corp.*, 248 F.3d 87, 95 (2d Cir. 2001), a nexus in time is alone insufficient to establish causation where disciplinary actions preceded the complaints of discrimination.  *See also Bernard v. J.P. Morgan Chase Bank N.A.*, No. 08 Civ. 4784 (THK), 2010 WL 423102, at *17 (S.D.N.Y. Feb. 5, 2010), *aff'd*, 408 F. App'x 465 (2d Cir. 2011) (observing that a causal nexus does not exist between protected activity and subsequent adverse action where discipline or expressed dissatisfaction with job performance preceded protected activity); *Wright v. N.Y. City Off-Track Betting Corp.*, No. 05 Civ. 9790 (WHP), 2008

WL 762196, at *5 (S.D.N.Y. Mar. 24, 2008) ("If an employer's conduct before and after an employee complaint is consistent, the post-complaint conduct is not retaliatory.").

Ms. Inguanzo relies solely on temporal proximity to support the causation element of the *prima facie* test.  *See* Pl. Opp. Mem. L. 17-18.  However, because Ms. Inguanzo had a well-documented history concerning her failure to prepare case notes and care plans on a timely basis, she cannot establish causation based on the timing of her complaint alone.  Specifically, Ms. Inguanzo was first subjected to discipline for late documentation in April 2010, 19 months before she was terminated.  The subsequent November 2010 performance review noted that Ms. Inguanzo occasionally fell behind on case notes and service plans.  Then, in February 2011, Mr. Horton again addressed the timeliness of progress notes in a meeting with Plaintiff.  Ms. Inguanzo's June 2011 performance review reflected that she was "often late" with care plans, and that Plaintiff did not recognize the importance of the timely submission of client documents. Two meetings were then held in July and August 2011, each predating Ms. Inguanzo's complaints of discrimination, wherein HSI addressed the timeliness of Plaintiff's care plans and related documentation.  During the July 2011 meeting, Ms. Inguanzo responded negatively to the criticism of her work and became hostile with Mr. Horton.  Accordingly, Ms. Kimmerle commented that Plaintiff was being insubordinate.  In the August 2011 meeting, Mr. Horton discussed with Ms. Inguanzo the issues related to the care plans and other client documents, and took issue with Plaintiff's comment to fellow HSI employees that he was "one frustrated program manager."

Similarly, in *Slattery*, "the only basis" for causation was a nexus in time.  248 F.3d at 95. There, the court found that an inference of retaliation did not arise because the "the adverse employment actions were both part, and the ultimate product of 'an extensive period of

45

progressive discipline' which began when Swiss Re diminished Slattery's job responsibilities a full *five months prior* to his filing of the EEOC charges." *Id.* In *Guidice v. Red Robin International, Inc.*, 555 F. App'x 67, 69 (2d Cir. 2014), the Second Circuit recently held that there was no genuine dispute of material fact with respect to the causation element, even where only two weeks separated the complaint of discrimination and the plaintiff's termination. There, the employer had issued a final written warning two years prior to the termination, and the plaintiff was found to have again violated the same company policies the month before his termination. *Id.* And in *Wolf v. Time Warner, Inc.*, 548 F. App'x 693, 696 (2d Cir. 2013), the court found that the plaintiff could not establish 'but-for' causation despite the fact that she was terminated only two months after a complaint of discrimination because she was the subject of numerous complaints and had previously been placed on a probationary program.[46]

The record here clearly reflects that Ms. Inguanzo was not only subject to discipline before her complaints of discrimination, but was also consistently told that the timeliness of her care plans and other client documents was a problem. That, coupled with the fact that Ms. Inguanzo was counseled prior to her complaints concerning acts of insubordination and attitudinal issues, makes clear that she is not entitled to the inference of causation based on the timing of her complaints. Accordingly, Plaintiff cannot make out a *prima facie* case of

---

[46] *See also Tomasino v. St. John's Univ.*, 476 F. App'x 923, 925 (2d Cir. 2012) (affirming summary judgment for employer where the only basis offered for establishing causal connection was temporal proximity between her complaint to human resources and her termination, and "the record [was] replete with undisputed evidence that Defendant imposed progressive discipline against [plaintiff] well before" the complaint was made); *Dawson v. City of New York*, No. 09 Civ. 5348 (PGG), 2013 WL 4504620, at *18 (S.D.N.Y. Aug. 19, 2013) ("*Slattery* applies here. Performance management of Dawson began more than fifteen months before she filed the NYSDHR complaint."); *Dixon v. Int'l Fed'n of Accountants*, No. 09 CV 2839 (HB), 2010 WL 1424007, at *7 (S.D.N.Y. Apr. 9, 2010) (holding that retaliation claim must be dismissed because plaintiff was subjected to repeated critiques about her management and performance skills before making a complaint about discrimination).

retaliation.  Defendants' motion for summary judgment on the Title VII retaliation claim is therefore GRANTED.

**V.  NYCHRL Claims**

As with the Title VII claims, the Complaint alleges discrimination based upon Plaintiff's gender, race, and national origin, as well as retaliation in connection with her complaints regarding discrimination, in violation of the NYCHRL.  Defendants argue that the Court should decline to exercise supplemental jurisdiction over the NYCHRL claims.  Defs. Mem. L. 21-22.

Where, as here, all federal law claims are eliminated before trial, the "traditional 'values of judicial economy, convenience, fairness, and comity'" weigh in favor of declining to exercise supplemental jurisdiction over any remaining state law claims.  *Kolari v. N.Y.-Presbyterian Hosp.*, 455 F.3d 118, 122 (2d Cir. 2006) (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988)).  Having dismissed all federal claims asserted in the Complaint, the Court declines to exercise supplemental jurisdiction over Plaintiff's claims under the NYCHRL.  28 U.S.C. § 1367(c)(3).  Therefore, Plaintiff's claims for discrimination and retaliation under the NYCHRL are DISMISSED without prejudice.

**VI.  Conclusion**

For the reasons set forth above, Defendants' motion for summary judgment is GRANTED.  The Clerk of the Court is respectfully directed to terminate the motion and close the case.  Doc. 27.

It is SO ORDERED.

Dated:     September 19, 2014
           New York, New York

Edgardo Ramos, U.S.D.J.

47